**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | |
|---|---|
| ALEC CHRISTOPHER BENNETT,<br><br>　　　　　　　　Plaintiff,<br><br>v.<br><br>TRANS UNION, LLC,<br>　　　　　　　　Defendant. | **Case No.:**<br><br><br><br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Alec Christopher Bennett ("Plaintiff" or "Mr. Bennett") a living, breathing 26-year-old consumer, brings this action on an individual basis, against Trans Union, LLC ("Trans Union" or "Defendant Trans Union") and states as follows:

## INTRODUCTION

1.      The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual American consumers. Data technology, whether it is used by businesses, banks, the Internal Revenue Service, or other institutions, allows information concerning individual consumers to flow instantaneously to requesting parties. Such timely information is intended to lead to faster and better decision-making by its recipients and, in theory, all of society should ultimately benefit from the resulting convenience and efficiency.

2.      However, unfortunately this information has also become readily available for, and subject to, mishandling and misuse. Individual consumers can and do sustain substantial damage, both economically and emotionally, whenever inaccurate or fraudulent information is

1

disseminated and/or obtained about them. In fact, Defendant Trans Union acknowledges this potential for misuse and resulting damage every time they sell their respective credit monitoring services to a consumer.

3.      The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs").

4.      These CRAs sell information to readily paying subscribers (i.e., retailers, landlords, lenders, potential employers, and other similar interested parties), commonly called "consumer reports," concerning individuals who may be applying for retail credit, housing, employment, or a car or mortgage loan.

5.      Since 1970, when Congress enacted the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* ("FCRA"), federal law has required CRAs to implement and utilize reasonable procedures "to assure maximum possible accuracy" of the personal, private, and financial information that they compile and sell about individual consumers.

6.      One of the primary purposes in requiring CRAs to assure "maximum possible accuracy" of consumer information is to ensure the stability of our banking system:

> The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

See 15 U.S.C. § 1681(a)(1).

7.      The preservation of one's good name and reputation is also at the heart of the FCRA's purposes:

> [W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life

and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as deny him the opportunity to obtain a mortgage or buy a home. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason. Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed.

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 cong. Rec. 36570 (1970)] (emphasis added).

8.     The FCRA also requires CRAs to conduct a reasonable reinvestigation to determine whether information disputed by consumers is inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which the CRA receives the notice of dispute from the consumer. This mandate exists to ensure that consumer disputes are handled in a timely manner and that inaccurate information contained within a consumer's credit report is corrected and/or deleted so as to not prevent said consumer from benefiting from his or her credit and obtaining new credit.

9.     In light of these important findings and purposes, Congress specifically noted "a need to insure that [CRAs] exercise their grave responsibilities with fairness, impartiality, and respect for the consumer's right to privacy." *See* 15 U. S.C. § 1681(a)(4).

10.     The FCRA also requires furnishers of information, a creditor or other third party that provides information about consumer to a CRA, upon notice, to conduct a reasonable reinvestigation of all disputes with regard to the completeness or accuracy of any information it provides to the CRAs regarding a consumer and modify, delete, or permanently block any items of information found to be inaccurate, incomplete, or unverifiable after said reinvestigation is completed.

11.     Plaintiff's claims arise out of Defendant Trans Union's blatantly inaccurate credit reporting, wherein Defendant Trans Union reported to Plaintiff's potential creditors that he is "deceased" and does not have a credit score.

12.     Accordingly, Plaintiff brings claims against Defendant Trans Union for failing to follow reasonable procedures to assure the maximum possible accuracy of Plaintiff's credit reports, in violation of the FCRA, 15 U.S.C. § 1681e(b), and failing to conduct a reasonable reinvestigation to determine whether information Plaintiff disputed was inaccurate and record the current status of the disputed information, or delete the disputed information from Plaintiff's credit file, in violation of the FCRA, 15 U.S.C. § 1681i.

13.     As part of this action, Plaintiff seeks actual, statutory, and punitive damages, costs, and attorneys' fees from Defendant Trans Union for their willful and/or negligent violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq*., as described herein.

## **PARTIES**

14.     Alec Christopher Bennett ("Plaintiff" or "Mr. Bennett") is a natural person residing in North Richland Hills, Texas, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

15.     Defendant Trans Union, LLC ("Defendant Trans Union" or "Trans Union") is a limited liability company with a principal place of business located at 555 West Adams Street, Chicago, Illinois 60661 and is authorized to do business in the State of Texas, including within this District. Trans Union can be served at its registered agent at Illinois Corporation Service Company, 801 Adlai Stevenson Drive, Springfield, Illinois 62703.

16.     Trans Union is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Trans Union is regularly engaged in the business of assembling, evaluating, and disseminating

4

information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d), to third parties.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, which allows claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

18.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## FACTS

### Summary of the Fair Credit Reporting Act

19.     The FCRA governs the conduct of consumer reporting agencies in an effort to preserve the integrity of the consumer banking system and to protect the rights of consumers to fairness and accuracy in the reporting of their credit information.

20.     The FCRA was designed to protect consumers from the harmful effects of inaccurate information reported in consumer reports (commonly referred to as "credit reports"). Thus, Congress enshrined the principles of "fair and accurate credit reporting" and the "need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness" in the very first provision of the FCRA. *See* 15 U.S.C. § 1681(a).

21.     Specifically, the statute was intended to ensure that "consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information. *See* 15 U.S.C. § 1681(b).

5

22.     To that end, the FCRA imposes the following twin duties on consumer reporting agencies: (i) consumer reporting agencies must devise and implement reasonable procedures to ensure the "maximum possible accuracy" of information contained in consumer reports (15 U.S.C. § 1681e(b)); and (ii) consumer reporting agencies must reinvestigate the facts and circumstances surrounding a consumer's dispute and timely correct any inaccuracies (15 U.S.C. § 1681i).

23.     The FCRA provides consumers with a private right of action against consumer reporting agencies that willfully or negligently fail to comply with their statutory obligations under the FCRA.

**Defendant Trans Union's Practices Concerning the Sale of Reports on the "Deceased"**

24.     Defendant Trans Union sells millions of consumer reports (often called "credit reports" or "reports") per day, and also sell credit scores.

25.     Pursuant to 15 U.S.C. § 1681e(b), consumer reporting agencies, like Defendant Trans Union, are required "to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

26.     Pursuant to 15 U.S.C. §§ 1681b and 1681e(a), consumer reporting agencies, like Defendant Trans Union, must maintain reasonable procedures to assure that consumer reports are sold only for legitimate 'permissible purposes."

27.     Defendant Trans Union routinely places a "deceased" notation or marking on reports when it is advised by any of its many data furnishing sources (such as banks, debt collectors, etc.) that a given consumer is deceased.

28.     Defendant Trans Union furnishing sources identify "deceased" consumers by marking the "status" of such consumer's responsibility for any subject account with an "X" or

"U/UNDESIGNATED" code in the "ECOA" field of an electronic data input format used in the credit reporting industry, known as Metro or Metro 2.

29.     Defendant Trans Union does not request or require a death certificate from any of their data sources which advise that a consumer is "deceased" before placing a "deceased" mark in that consumer's credit file.

30.     Defendant Trans Union does not request or require any proof from any data source which advises that a consumer is "deceased," showing that the consumer is in fact deceased before placing a "deceased" mark on that consumer's report.

31.     Defendant Trans Union does not independently verify with any source that a consumer is in fact deceased before placing a "deceased" mark on that consumer's report.

32.     In some cases, in order to assure accuracy, Defendant Trans Union may send letters and/or other communications to consumers when certain information that may be considered suspicious or unreliable is furnished about said consumers to be placed in their credit files, such as in cases where consumers have a freeze or fraud alert on their credit report, or in accordance with certain state laws, such as the consumer laws of Colorado. Defendant Trans Union does not have any procedure to notify consumers (such as a next of kin or executor or administrator of the consumer's estate) when an "X" or "U/UNDESIGNATED" deceased code is furnished to them to be placed in said consumer's credit file or report.

33.     The Social Security Administration (SSA) maintains the **Death Master File ("DMF")**. The DMF is also known commercially as the Social Security Death Index (SSDI). The SSA's DMF as of 2018 contained information on 111 million deaths that have been reported to the SSA. The DMF is created from internal SSA records of deceased persons possessing social security numbers and whose deaths were reported to the SSA. The DMF includes the following

information on each decedent, if the data are available to the SSA:  social security number, name, date of birth, and date of death.

34.     Legislation (i.e., the Social Security Act) precludes the sharing of the full DMF with non-benefits paying agencies.

35.     Because of the wide use and demand for death records for a variety of industries, SSA has partnered with the U.S. Department of Commerce's National Technical Information Service (NTIS) to release the Limited Access Death Master File (LADMF) electronically on a weekly and monthly basis.

36.     The SSA receives death reports from many sources, including family members, funeral homes, financial institutions, postal authorities, state information, and other federal agencies.  The SSA does not have a death record for all persons; therefore, the SSA does not guarantee the veracity of the DMF.  The SSA does not guarantee 100% of the data.

37.     The SSA estimates that roughly 12,000 living people are added to the DMF annually, potentially due to clerical error.  An erroneous listing can lead to not only a cessation of government benefits, but also the freezing of bank accounts, the inability to buy or rent property, and mistaken accusations of identity theft.

38.     The Office of the Inspector General called the error rate "very low," but noted that "SSA's erroneous death entries can lead to mistaken benefit terminations and cause severe financial hardship and distress to affected people...when errors like this occur, it can be a long and difficult process to resurrect your financial health.

39.     Upon information and belief, Defendant Trans Union does not have access to the full DMF from the SSA, but rather is a subscriber to the NTIS LADMF.

40. Upon information and belief, despite being a subscriber of the NTIS LADMF, Defendant Trans Union does not cross-reference the "X", or "U/UNDESIGNATED" code received from data furnishers with the LADMF in order to determine whether any given consumer reported as deceased via a furnishing source is also on the LADMF *before* selling a credit report about said consumer, or at any time.

41. Upon information and belief, Defendant Trans Union will only cross-reference the NTIS LADMF to sell additional products for an additional fee to their subscribers regarding information contained within the LADMF.

42. Defendant Trans Union failed to employ reasonable procedures that assure that a consumer with a "deceased" mark on his/her report is in fact actually deceased before placing the "deceased" mark on that consumer's report and selling that report for profit.

43. Even in instances where other data on the face of the consumer's report indicates that he/she is not deceased, Defendant Trans Union does not employ any procedures to assure that a consumer with a "deceased" mark on his/her report is in fact actually deceased before placing the "deceased" mark in that consumer's file.

44. Even in instances where the purportedly deceased consumer communicates directly with Defendant Trans Union, Trans Union does not employ any procedures to assure that a consumer with a "deceased" mark on his/her report is in fact actually deceased before placing the "deceased" mark on that consumer's report.

45. Once a "deceased" mark is placed upon a consumer's report, Defendant Trans Union will not calculate and will not provide a credit score for that consumer.

46.     Upon Defendant Trans Union's reports with a "deceased" mark sold to third parties, Defendant Trans Union never calculate or provide a credit score for that consumer and instead report that consumer's credit score as "N/A."

47.     Defendant Trans Union knows that third party credit issuers require a credit score in order to process a given credit application.

48.     Defendant Trans Union knows that consumers without credit scores are unable to secure any credit from most credit issuers.

49.     Defendant Trans Union knows that living consumers are routinely turned down for credit specifically because they are reporting them as "deceased" and without a credit score.

50.     Defendant Trans Union has been put on notice for years through consumer disputes and lawsuits that living, breathing consumers are turned down for credit specifically because Defendant Trans Union are inaccurately reporting them as "deceased" and without a credit score.

51.     Defendant Trans Union has received and documented many disputes from consumers complaining that Defendant Trans Union had erroneously marked them as "deceased" on their credit reports.

52.     Defendant Trans Union knows that thousands of consumers are erroneously marked as "deceased" on their credit reports via an erroneous furnishing of the "X" or "U/UNDESIGNATED" code, even when said consumers are not on the Death Master File and are in fact alive.

53.     Defendant Trans Union also knows that the Death Master File is not always accurate and should not solely rely on the information contained within the Death Master File, especially when they receive conflicting information from different sources.

54.     Nevertheless, Defendant Trans Union does not employ any procedures to assure that a consumer marked as "deceased" on their credit reports is in fact deceased.

55.     Even consumers who dispute the erroneous "deceased" status on their credit reports continue to be erroneously marked as deceased unless the furnishing source which provided the erroneous "X" or "U/UNDESIGNATED" code in the first instance modifies its reporting first.

56.     Defendant Trans Union does not have any independent procedure to change an erroneous deceased status on their own and will merely parrot their furnishing source in the case of a reinvestigation into the accuracy of the deceased status upon a consumer's report, a reinvestigation which is triggered by a consumer dispute.

57.     Nor does Defendant Trans Union employ any procedures to limit or stop the furnishing of reports to third parties for consumers that they have marked as "deceased" under any circumstances.

58.     For years after a consumer's actual death, Defendant Trans Union will continue to sell credit reports about that consumer.

59.     Defendant Trans Union will only remove a deceased consumer's file from their respective credit reporting databases when it is no longer valuable to them—meaning that no one is continuing to purchase reports about that consumer.

60.     Defendant Trans Union charges third parties a fee for reports with a mark that a consumer is deceased ("reports on the deceased") as they would for any other report.

61.     Defendant Trans Union profits from the sale of reports on deceased consumers.

62.     Defendant Trans Union has in their respective credit reporting databases many "deceased" tradelines corresponding to distinct credit files for individual consumers that they have marked as "deceased."

63.     Defendant Trans Union knows that truly deceased consumers do not apply for credit.

64.     Defendant Trans Union knows that the credit information and reports of truly deceased persons are used by criminals to commit identity theft or credit fraud. Indeed, identity theft using the personal identifying information of deceased consumers is known to Defendant Trans Union to be a common and major source of identity theft.

65.     Defendant Trans Union knows that identity theft and credit fraud are serious and widespread problems in our society.

66.     Defendant Trans Union warns the relatives of truly deceased consumers that identity theft can be committed using the credit reports and information of the deceased and require relatives to provide a death certificate or executorship papers, among other forms of proof, before accessing the deceased consumer's credit information or report.

67.     Defendant Trans Union has no similar death certificate, executorship paper, or any other proof requirements for their data sources, which report a consumer as deceased or for the purchasers of their reports who access the purportedly deceased consumer's information.

68.     Defendant Trans Union sells reports on supposedly deceased consumers to third parties in an automated fashion and without any specific or general certification that could reasonably explain a "permissible purpose" for purchasing or using a (supposedly) deceased consumer's credit history and/or report.

69.     For consumers who are deceased, there rarely, if ever, exists a permissible purpose under the FCRA for Defendant Tran Union to sell their credit reports, absent a court order.

70.     Defendant Tran Union knows that such reports contain a vast amount of personal identifying and credit account information on the supposedly deceased consumer, information that can be used to commit identity theft or for other fraudulent purposes.

**Plaintiff Discovered that He was being Reported as Deceased**

71.     In or around 2020, Plaintiff applied for food stamps at the Texas Health and Human Services office ("THHS").

72.     The THHS office refused to approve Plaintiff for food stamps because he was reported as deceased by the Social Security Administration ("SSA").

73.     Accordingly, Plaintiff went to his local Social Security Administration office to get the information corrected.

74.     On or about October 18, 2021, Plaintiff received a letter from local Social Security Administration office indicating that he is alive. After receipt of this letter, Plaintiff believed that this issue was resolved.

75.     Furthermore, Plaintiff had no reason to believe that any CRA was reporting him deceased within his credit file.

**Plaintiff Discovers Experian Reporting as Deceased**

76.     On or about September 8, 2023, Plaintiff tried to get pre-approved for a Capital One credit card.  Shortly after submitting his credit application, Plaintiff received a denial from Capital One. The denial specifically stated that they were unable to approve Plaintiff because on one of Plaintiff's credit reports the "[Plaintiff] is reported as deceased."

77.     On or about September 15, 2023, Plaintiff submitted a credit application for an American Express credit card.  Shortly after submitting his credit application, Plaintiff received a denial from American Express. The denial did not specifically state the reason for the denial, but

Plaintiff believed it had to do with the deceased notation that he discovered when he submitted his Capital One pre-approval application.

78.     Despite getting information corrected with Social Security Administration back in 2021, Capital One and American Express denied Plaintiff's pre-approval application based upon the existence of a deceased notation on Plaintiff's credit file.

79.     In or around September 2023, Plaintiff viewed a copy of his Experian, Equifax, and TransUnion credit files.  Upon review, Plaintiff discovered that there was a deceased notation on his Experian credit file.

80.     Notably, in September 2023, TransUnion and Equifax were not reporting the deceased notation on his credit file like Defendant Experian.

81.     On or about November 13, 2023, Experian removed the deceased notation.

**Plaintiff Discovers that Trans Union Reporting him as Deceased**

82.     On or about November 27, 2023, believing the issue had been resolved and eager to move on with his life and build up his credit, Plaintiff applied for a Capital One credit card.

83.     For Capital One to make a determination on Plaintiff's pre-approval, it would need to obtain copies of his credit files. Plaintiff provided Capital One with his personal identification information, including his Social Security number, and authorized it to obtain copies of his credit files.

**Capital One Denies Plaintiff's Credit Application**

84.     Shortly after submitting his credit application, Plaintiff received a denial from Capital One. The denial specifically stated that they were unable to approve Plaintiff because on one of Plaintiff's credit reports the "[Plaintiff] is reported as deceased."

14

85.     Despite getting information corrected with Social Security Administration back in 2021, and with Experian in November 2023, Capital One denied Plaintiff's pre-approval application based upon the existence of a deceased notation on Plaintiff's credit file.

### Plaintiff Obtains His Credit Reports and Confirms the
### Deceased Notation on his Trans Union Credit File

86.     In or around November 2023, Plaintiff viewed a copy of his Experian, Equifax, and Trans Union credit files.

87.     Upon review, Plaintiff discovered that there was a deceased notation on his Trans Union credit file.

88.     Specifically, Trans Union reported the deceased notation in the "Responsibility" field of the Wells Fargo Account (Account No. 446540XXXXXXXXXX) owed by Plaintiff.

89.     Notably, the other non-party CRAs, Experian and Equifax were not reporting the deceased notation on his credit file like Defendant Trans Union.

90.     Due to Defendant Trans Union inaccurately reporting him as deceased on his credit file, Plaintiff was not offered any credit by Capital One.

91.     Upon information and belief, due to the deceased notation on his credit file, Defendant Trans Union would not have been reporting a credit score, which would also serve as a basis for Capital One's denial of his application.

92.     Trans Union violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy of the credit information it published and maintained concerning Plaintiff.

### Plaintiff's Dispute to Defendant Trans Union Regarding the
### Inaccurate Credit Reporting in November 2023

93.     On or around December 15, 2023, shocked, disappointed, frustrated, and worried that he was never going to be able to escape the inaccurate deceased notation, Plaintiff disputed the deceased notation with Trans Union via certified mail.

94.     Plaintiff's dispute was received by Trans Union on or about December 23, 2023.

95.     On or about December 27, 2023, Plaintiff received a response from Defendant Trans Union acknowledging Plaintiff's dispute; however, Defendant Trans Union refused to investigate because it believed, erroneously, that the dispute was coming from an unauthorized third party.

96.     Thereafter, Defendant Trans Union failed to correct or delete the deceased notion appearing in Plaintiff's credit file.

97.     Trans Union failed to conduct a reasonable investigation of Plaintiff's December 15, 2023, dispute, or any reinvestigation whatsoever, to determine whether the disputed information is inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

**Defendant Trans Union's Method for Considering Consumer Credit Report Disputes**

98.     The credit industry has constructed a method of numeric-alpha codes for considering consumer credit report disputes. See 15 U.S.C. § 1681i(a)(5)(D).

99.     The credit bureaus, Equifax, Experian, Trans Union, and Innovis, have thus created the Online Solution for Complete and Accurate Reporting, or e-OSCAR, as the credit industries' standard of performance. e-OSCAR allows the credit bureaus to create and data furnishers to respond to disputes initiated by consumers by routing credit reporting agency-created prompts for automated consumer dispute verifications to the appropriate data furnishers. e-OSCAR utilizes a numeric-alpha language specific to the credit reporting industry.

100.    That lexicon or unique language is commonly referred to in the credit reporting industry as "Metro 2 Format" or "Metro 2."

101.    It is also known industry wide as the CDIA's "Credit Reporting Resource Guide."

102.    Metro 2 is driven by numeric codes that translate into specific alpha representations about consumers' creditworthiness and character that will ultimately appear on credit reports issued to third parties who make credit, insurance, rental, and employment decisions regarding consumers.

103.    Metro 2 codes are used on an industry wide form known within the credit industry as an Automated Consumer Dispute Verification ("ACDV") electronic form.

104.    The ACDVs have many fields in their body for use in effecting thorough and complete communications between data furnishers and the credit reporting agencies.

105.    These ACDV "fields" have various titles for the many substantive areas into which the Metro 2 codes can be entered.

106.    Upon receiving a dispute from a consumer, the credit bureaus have an automated system that prepares ACDVs that are sent to each of the data furnishers that are reporting the credit accounts disputed by a consumer.

107.    The data furnishers then have an obligation under the FCRA to conduct a reasonable reinvestigation with respect to the disputed credit account and review all relevant information provided by the consumer with the dispute to determine whether the disputed credit account information is accurate and/or belongs to the disputing consumer. See 15 U.S.C. § 1681s-2(b).

108.    Once the data furnisher completes its reinvestigation, it will code the ACDV accordingly, representing either that the disputed account was verified as accurate and belonging

to the disputing consumer, updating information related to the account, or deleting the account entirely, and return the ACDV to the respective credit bureau(s) via e-OSCAR.

109.    Plaintiff reasonably believes that Defendant Trans Union continues to publish that he was deceased in the credit reports it issues about him.

110.    As a result of the "deceased" notation, the Defendant Trans Union made it practically impossible for Plaintiff to continue to obtain credit.

111.    At all times pertinent hereto, Defendant Trans Union was acting by and through its agents, servants, and/or employees who was acting within the course and scope of its agency or employment, and under the direct supervision and control of the Defendant herein.

112.    At all times pertinent hereto, the conduct of Defendant Trans Union, as well as that of its respective agents, servants, and/or employees, was intentional, willful, reckless, grossly negligent and in utter disregard for federal law and the rights of Plaintiff herein.

113.    As a standard practice, Defendant Trans Union does not conduct independent investigations in response to consumer disputes. Instead, it merely parrots the response of the credit furnisher despite numerous court decisions admonishing this practice. See Cushman v. Trans Union Corp., 115 F.3d 220, 225 (3d Cir. 1997) (The 'grave responsibilit[y]' imposed by § 1681i(a) must consist of something more than merely parroting information received from other sources. Therefore, a 'reinvestigation' that merely shifts the burden back to the consumer and the credit grantor cannot fulfill the obligations contemplated by the statute."); Apodaca v. Discover Fin. Servs., 417 F. Supp. 2d 1220, 1230-31 (D.N.M. 2006) (noting that credit reporting agencies may not rely on automated procedures that make only superficial inquiries once the consumer has notified it that information is disputed); Gorman v. Experian Info. Sols., Inc., 2008 WL 4934047, at *6 (S.D.N.Y. Nov. 19, 2008).

114.     Defendant Trans Union is aware of the shortcomings of its procedures and intentionally chose not to comply with the FCRA to lower its costs.  Accordingly, Defendant Trans Union's violations of the FCRA are willful.

115.     As a result of Defendant Trans Union's conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of the ability to purchase and benefit from his good credit rating; detriment to his credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

## CLAIMS FOR RELIEF

### COUNT I
### 15 U.S.C. § 1681e(b)
### Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy
### (First Claim for Relief Against Defendant Trans Union)

116.     Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

117.     The FCRA imposes a duty on consumer reporting agencies to devise and implement procedures to ensure the "maximum possible accuracy" of consumer reports, as follows:

> Whenever a consumer reporting agency prepares a consumer report, it shall follow reasonable procedures to assure ***maximum possible accuracy*** of the information concerning the individual about whom the report relates.

15 U.S.C. §1681e(b) (emphasis added).

118.     On numerous occasions, Defendant Trans Union prepared patently false consumer reports concerning Plaintiff.

119.    Despite actual and implied knowledge that Plaintiff is not dead, Defendant Trans Union readily sold such false reports to one or more third parties, thereby misrepresenting Plaintiff, and ultimately Plaintiff's creditworthiness.

120.    Defendant Trans Union violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiff.

121.    As a result of Defendant Trans Union's conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

122.    Defendant Trans Union's conduct, actions, and inactions were willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. Alternatively, they were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

123.    Plaintiff is entitled to recover attorneys' fees and costs from Defendant Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

**COUNT II**
**15 U.S.C. § 1681i**
**Failure to Perform a Reasonable Reinvestigation**
**(Second Claim for Relief Against Defendant Trans Union)**

124.    Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

125.    The FCRA mandates that a CRA conducts an investigation of the accuracy of information "[I]f the completeness or accuracy of any item of information contained in a consumer's file" is disputed by the consumer. See 15 U.S.C. § 1681i(a)(1). The Act imposed a 30-day time limit for the completion of such an investigation. *Id.*

126.    The FCRA provides that if a CRA conducts an investigation of disputed information and confirms that the information is in fact inaccurate or is unable to verify the accuracy of the disputed information, the CRA is required to delete that item of information from the consumer's file. See 15 U.S.C. § 1681i(a)(5)(A).

127.    On or about December 15, 2023, Plaintiff disputed the inaccurate information with Defendant Trans Union and requested that they correct and/or delete a specific item in his credit file that is patently inaccurate, misleading, and highly damaging to him, namely, stating that he is "deceased."

128.    In response to Plaintiff's dispute, Trans Union failed to conduct a reinvestigation, or such investigation was so shoddy as to allow patently false, logically inconsistent, and damaging information to remain in Plaintiff's credit file.

129.    Defendant Trans Union violated 15 U.S.C. § 1681i by failing to conduct a reasonable reinvestigation to determine whether the disputed information was inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which they received the notices of dispute from Plaintiff; and by failing to maintain reasonable procedures with which to filter and verify disputed information in Plaintiff's credit file.

130.    As a result of the Defendant Trans Union's conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from his good credit

rating; detriment to his credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

131.   Defendant's Trans Union's conduct, actions, and inactions were willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. Alternatively, they were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

132.   Plaintiff is entitled to recover attorneys' fees and costs from Defendant Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for the following relief:

i.   Determining that Defendant Trans Union negligently and/or willfully violated the FCRA;

ii.   Awarding Plaintiff actual, statutory, and punitive damages as provided by the FCRA;

iii.   Awarding Plaintiff reasonable attorneys' fees and costs as provided by the FCRA; and,

iv.   Granting further relief, in law or equity, as this Court may deem appropriate and just.

## DEMAND FOR JURY TRIAL

Plaintiff is entitled to and hereby demands a trial by jury on all issues so triable.

//

Respectfully submitted this 21st day of February 2024.

*/s/ Beth K. Findsen*
Beth K. Findsen, TX No. 24002679
**CONSUMER ATTORNEYS**
8245 N. 85th Way
Scottsdale, AZ 85258
T: 602-807-6676
F: 718-715-1750
E: bfindsen@consumerattorneys.com

Shawn Jaffer
**JAFFER & ASSOCIATES, PLLC**
5757 Alpha Rd, Suite 580
Dallas, TX 75240
T: 214-945-0000
F: 888-509-3910
E: shawn@jaffer.law

*Attorneys for Plaintiff Alec Christopher Bennett*